UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CA09- 620

~~CA09 - 029~~

| | | |
|---|---|---|
| MARK WUOTILA, Derivatively on Behalf of CVS CAREMARK CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | Case No. |
| THOMAS M. RYAN, HOWARD A. MCLURE, DAVID B. RICKARD, JONATHAN C. ROBERTS, KRISTEN E. GIBNEY WILLIAMS, EDWIN M. BANKS, MARIAN L. HEARD, WILLIAM H. JOYCE, RICHARD J. SWIFT, TERRENCE MURRAY, SHELI Z. ROSENBERG, DAVID W. DORMAN, C. DAVID BROWN II, JEAN-PIERRE MILLON, and C.A. LANCE PICCOLO, | ) ) ) ) ) ) ) ) ) ) ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | ) ) | |
| and | ) ) | |
| CVS CAREMARK CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

DEMAND FOR JURY TRIAL

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of CVS Caremark Corporation ("CVS" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal and state law, including violations of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, violations of §20(a) of the Exchange Act, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that have caused substantial monetary losses to CVS and other damages, such as to its reputation and goodwill.

2.      During March 2007, CVS Corporation, a retail pharmacy operator, and Caremark Rx, Inc., a Pharmacy Benefit Manager ("PBM") merged to form CVS.  Ever since the merger, CVS has operated two business segments tied to the retail pharmacy business and the PBM business.  CVS derives roughly half of its revenue from each of these segments.

3.      The PBM business generates revenues by entering into contracts with various clients to provide services related to the negotiation of drug prices.  Accordingly, the PBM business' revenues are heavily dependant upon CVS' ability to renew and sign new contracts to provide these services.  A particular year's selling season, which is the period during which CVS attempts to renew contracts and sign new contracts, can have a substantial effect on the proceeding year's revenues.

4.      During 2009, under defendants' direction, CVS and defendant Thomas M. Ryan ("Ryan"), CVS' Chairman, Chief Executive Officer ("CEO"), and President, made false and misleading statements regarding the 2009 selling season and the Company's expected PBM business prospects for 2010.  In particular, defendant Ryan and CVS issued optimistic statements to the effect

that potential new and renewal PBM clients were impressed by the Company's combined business model and its new Maintenance Choice program that supposedly offered clients lower overall healthcare costs. The Maintenance Choice program allows health plan members to choose to pick up their prescriptions at a CVS retail store at mail-order prices rather than just receiving prescriptions by mail.

5.     In truth, however, CVS' marketing based upon the combined business model and the Maintenance Choice program was not winning over clients. This is because many clients considered the Maintenance Choice program to be little more than a thinly veiled attempt to use the PBM business to drive up revenues at CVS retail stores. These clients believed that CVS was neglecting its PBM services in an effort to drive up retail profits by enticing health plan members to purchase convenience items such as toothpaste, food, and other items at CVS retail stores while they picked up their prescriptions.

6.     On November 5, 2009, during an investor conference call, defendant Ryan revealed that the 2009 selling season had been a dismal failure—CVS had a $4.8 billion net loss of its PBM contracts. As a result, CVS' PBM operating profit is now expected to decline as much as 10 - 12% during 2010. Ryan also admitted that CVS' defective marketing campaign was to blame for the client losses. After this devastating disclosure, CVS stock price declined from $36.15 per share on November 4, 2009 to $28.87 per share on November 5, 2009, which represents a market capitalization loss of $10.1 billion.

7.     While CVS' stock price was artificially inflated as a result of CVS' and defendant Ryan's false statements, defendants authorized and failed to halt the repurchase of over $1.99 billion of the Company's stock at artificially inflated prices. Even worse, certain defendants contemporaneously sold $47.4 million of their personally held shares at artificially inflated prices.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.

9.      This Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(3) in that plaintiff and defendants are citizens of different states and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) CVS maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to

CVS, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

14.    Plaintiff Mark Wuotila was a shareholder of CVS at the time of the wrongdoing complained of and has continuously been a shareholder and is a current CVS shareholder. Plaintiff is a citizen of California.

15.    Nominal defendant CVS is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island. On March 22, 2007, CVS Corporation, an operator of retail pharmacy stores, merged with Caremark Rx, Inc., a PBM, to form CVS.

16.    Defendant Ryan is CVS' President and CEO and has been since May 1998. Ryan is also CVS' Chairman of the Board (the "Board") and has been since November 2007 and a director and has been since July 1996. Ryan was CVS Corporation's Chairman from April 1999 to the closing of the CVS/Caremark merger in March 2007. Defendant Ryan knowingly or recklessly made false statements regarding CVS' 2010 PBM business prospects. Defendant Ryan also authorized the repurchase of shares and failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of the false and misleading statements regarding CVS' business prospects. Additionally, Ryan misappropriated material non-public information regarding CVS' business prospects and sold 400,000 shares of CVS stock for $13,763,120 while in possession of that material non-public information. The following graph illustrates Ryan's sales between May 5, 2009 and November 4, 2009 (the "Suspicious Sales Period"), the period during which CVS' share price was artificially inflated due to false and misleading statements regarding CVS' business prospects:





Defendant Ryan is a citizen of Rhode Island. CVS paid Ryan the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $1,400,000 | $8,902,769 | $4,083,648 | $4,568,503 | $4,681,613 | $466,115 |
| 2007 | $1,350,000 | $9,390,798 | $3,486,931 | $7,808,034 | $3,505,295 | $556,732 |

17.    Defendant Howard A. McLure ("McLure") is CVS' Executive Vice President and President of Caremark Pharmacy Services and has been since March 2007. Prior to the closing of the CVS/Caremark merger in March 2007, McLure was also Caremark Rx Inc.'s Senior Executive Vice President and Chief Operating Officer from June 2005 to March 2007 and Executive Vice President and Chief Financial Officer from May 2000 to June 2005. CVS has announced that McLure will retire effective November 27, 2009. McLure misappropriated material non-public information regarding CVS' business prospects and sold 500,000 shares of CVS stock for

$17,729,785.67 while in possession of that material non-public information. The following chart illustrates McLure's sales during the Suspicious Sales Period, the period during which CVS' share price was artificially inflated due to false and misleading statements regarding CVS' business prospects:



Defendant McLure is a citizen of Tennessee. CVS paid McLure the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $781,154 | $1,780,004 | $1,045,548 | $600,000 | $235,286 | $20,695 |
| 2007 | $589,462 | $388,898 | $512,032 | $1,950,000 | $67,034 | $27,164 |

18.    Defendant David B. Rickard ("Rickard") is CVS' Executive Vice President, Chief Financial Officer, and Chief Administrative Officer and has been since September 1999. CVS has announced that Rickard will be retiring at the end of 2009. Rickard misappropriated material non-

public information regarding CVS' business prospects and sold 251,520 shares of CVS stock for $8,540,864.64 while in possession of that material non-public information. The following chart illustrates Rickard's sales during the Suspicious Sales Period, the period during which CVS' share price was artificially inflated due to false and misleading statements regarding CVS' business prospects:



Defendant Rickard is a citizen of Massachusetts. CVS paid Rickard the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $775,000 | $989,094 | $1,211,678 | $1,356,632 | $618,614 | $145,517 |
| 2007 | $762,500 | $1,154,633 | $997,795 | $2,435,022 | $599,572 | $191,697 |

19.    Defendant Jonathan C. Roberts ("Roberts") is CVS' Executive Vice President, Rx Purchasing, Pricing and Network Relations and has been since January 2009. Roberts works in CVS' PBM business segment. Roberts misappropriated material non-public information regarding CVS' business prospects and sold 104,000 shares of CVS stock for $3,230,728.80 while in possession of that material non-public information. The following chart illustrates Roberts' sales during the Suspicious Sales Period, the period during which CVS' share price was artificially inflated due to false and misleading statements regarding CVS' business prospects:



Defendant Roberts is a citizen of Rhode Island.

20.    Defendant Kristen E. Gibney Williams ("Gibney Williams") is a CVS director and has been since March 2007. Gibney Williams is also a member of CVS' Audit Committee and has been since at least March 2009. As a director, defendant Gibney Williams will receive an annual retainer in 2009 equivalent to $260,000. Defendant Gibney Williams knowingly or recklessly: (i) reviewed

and approved false statements regarding CVS' 2010 PBM business prospects; and (ii) failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' business prospects.    Additionally, Gibney Williams misappropriated material non-public information regarding CVS' business prospects and sold 127,431 shares of CVS stock for $4,186,223.04 while in possession of that material non-public information.  The following chart illustrates Gibney Williams' sales during the Suspicious Sales Period, the period during which CVS' share price was artificially inflated due to false and misleading statements regarding CVS' business prospects:



Defendant Gibney Williams is a citizen of Arizona.

21.    Defendant Edwin M. Banks ("Banks") is a CVS director and has been since March 2007.  Banks is also a member of CVS' Audit Committee and has been since at least March 2009. As a director, defendant Banks will receive an annual retainer in 2009 equivalent to $260,000.

Defendant Banks knowingly or recklessly: (i) reviewed and approved false statements regarding CVS' 2010 PBM business prospects; and (ii) failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' business prospects. Defendant Banks is a citizen of New Jersey.

22.    Defendant Marian L. Heard ("Heard") is a CVS director and has been since September 1999. Heard is also a member of CVS' Audit Committee and has been since at least March 2009. As a director, defendant Heard will receive an annual retainer in 2009 equivalent to $260,000. Defendant Heard knowingly or recklessly: (i) reviewed and approved false statements regarding CVS' 2010 PBM business prospects; and (ii) failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' business prospects. Defendant Heard is a citizen of Massachusetts.

23.    Defendant William H. Joyce ("Joyce") is a CVS director and has been since April 1994. Joyce is also Chairman of CVS' Audit Committee and has been since at least March 2009. As a director, defendant Joyce will receive an annual retainer in 2009 equivalent to $260,000 and an additional $20,000 for serving as the Chairman of CVS' Audit Committee. Defendant Joyce knowingly or recklessly: (i) reviewed and approved false statements regarding CVS' 2010 PBM business prospects; and (ii) failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' business prospects. Defendant Joyce is a citizen of Connecticut.

24.    Defendant Richard J. Swift ("Swift") is a CVS director and has been since September 2006. Swift is also a member of CVS' Audit Committee and has been since at least March 2009. As a director, defendant Swift will receive an annual retainer in 2009 equivalent to $260,000. Defendant Swift knowingly or recklessly: (i) reviewed and approved false statements regarding CVS'

2010 PBM business prospects; and (ii) failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' business prospects. Defendant Swift is a citizen of New Jersey.

25.    Defendant Terrence Murray ("Murray") is a CVS director and has been since October 1996. Murray is also CVS' Lead Director and has been since November 2007. As a director, defendant Murray will receive an annual retainer in 2009 equivalent to $260,000 and an additional $20,000 for serving as the Lead Director. Defendant Murray knowingly or recklessly failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' 2010 PBM business prospects. Defendant Murray is a citizen of Rhode Island.

26.    Defendant Sheli Z. Rosenberg ("Rosenberg") is a CVS director and has been since May 1997. As a director, defendant Rosenberg will receive an annual retainer in 2009 equivalent to $260,000 and an additional $10,000 for serving as the Chair of the Management Planning and Development Committee. Defendant Rosenberg knowingly or recklessly failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' 2010 PBM business prospects. Defendant Rosenberg is a citizen of Illinois.

27.    Defendant David W. Dorman ("Dorman") is a CVS director and has been since March 2006. As a director, defendant Dorman will receive an annual retainer in 2009 equivalent to $260,000 and an additional $10,000 for serving as the Chair of the Nominating and Corporate Governance Committee. Defendant Dorman knowingly or recklessly failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' 2010 PBM business prospects. Defendant Dorman is a citizen of Georgia.

- 11 -

28.    Defendant C. David Brown II ("Brown") is a CVS director and has been since March 2007.  As a director, defendant Brown will receive an annual retainer in 2009 equivalent to $260,000.  Defendant Brown knowingly or recklessly failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' 2010 PBM business prospects.  Defendant Brown is a citizen of Florida.

29.    Defendant Jean-Pierre Millon ("Millon") is a CVS director and has been since March 2007.  As a director, defendant Millon will receive an annual retainer in 2009 equivalent to $260,000.  Defendant Millon knowingly or recklessly failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' 2010 PBM business prospects.  Defendant Millon is a citizen of Arizona.

30.    Defendant C.A. Lance Piccolo ("Piccolo") is a CVS director and has been since March 2007.  As a director, defendant Piccolo will receive an annual retainer in 2009 equivalent to $260,000.  Defendant Piccolo knowingly or recklessly failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' 2010 PBM business prospects.  Defendant Piccolo is a citizen of Arizona.

31.    The defendants identified in ¶¶16, 20-30 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶16-19 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶20-24 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶16-20 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants, the Audit Committee Defendants, and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

- 12 -

32.    By reason of their positions as officers, directors, and/or fiduciaries of CVS and because of their ability to control the business and corporate affairs of CVS, the Individual Defendants owed CVS and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CVS in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CVS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.    Each director and officer of the Company owes to CVS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Audit Committee Duties

34.    In addition to these duties, the Audit Committee Defendants owed specific duties, under its charter in effect during 2009, to CVS to review and approve earnings press releases and statements made during earnings conference calls. In particular, the Audit Committee's charter in effect during 2009 provided as follows:

**Responsibilities**

In addition to any other responsibilities that may be assigned from time to time by the Board, the Audit Committee is responsible for the following matters.

\* \* \*

*Financial Statements; Disclosure and Other Risk Management and Compliance Matters*

- 13 -

• As appropriate, the Audit Committee shall meet to review and discuss with management, the internal auditors and the independent auditor, in separate meetings if the Audit Committee deems it necessary:

> • the annual audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-K;

> • the quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-Q;

> • any analyses or other written communications prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

* * *

• The Audit Committee shall review, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies, including in each case the type of information to be disclosed and type of presentation to be made and paying particular attention to the use of non-GAAP financial information.

**Control, Access, and Authority**

35.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of CVS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

36.    Because of their advisory, executive, managerial, and directorial positions with CVS, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of CVS, including the Company's PBM business prospects.

37.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CVS, and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

38.    To discharge their duties, the officers and directors of CVS were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of CVS were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects;

(e)    remain informed as to how CVS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

- 15 -

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules and regulations.

## Breach of Duties

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CVS, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of CVS' Board.

40.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its 2010 PBM business prospects, as detailed herein below, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of securities laws.  As a result, CVS has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its 2010 PBM business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at CVS and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) facilitate the Insider Selling Defendants' illicit sale of $47.4 million of their personally held shares while in possession of material non-public information; and (iv) deceive the investing public, including shareholders of CVS, regarding the Individual Defendants' management of CVS' operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by defendants.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

43.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to conceal the true facts regarding the CVS' 2010 PBM business prospects.

44.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to facilitate the sale of over $47.4 million of personally held shares.

45.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently

release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND AND OVERVIEW

47.    On March 22, 2007, CVS Corporation, an operator of retail pharmacy stores, merged with Caremark Rx, Inc., a PBM, to form CVS. Since the merger, CVS has operated two principal business segments: the Pharmacy Services Segment and the Retail Pharmacy Segment. The Pharmacy Services Segment provides PBM services, which are drug price negotiations services offered to companies and governments. The Retail Pharmacy Segment operates retail drugstores located in forty-one states and the District of Columbia. CVS generates roughly half of its revenues from the Pharmacy Services Segment; and the remaining half from the Retail Pharmacy Segment.

48.    The Pharmacy Services Segment primarily generates revenues by entering into contracts with various clients to provide PBM services. According to CVS' fiscal 2008 Form 10-K filed on February 27, 2009 with the U.S. Securities and Exchange Commission ("SEC"), approximately one third of the Pharmacy Services Segment's contracts are up for renewal each year. Accordingly, a particular year's selling season, during which CVS attempts to gain contract renewals and land new contracts, can have a substantial effect on the proceeding year's revenues. Because of this, the 2008 Form 10-K warned that "[t]he possibility of customer loss and/or the failure to win

- 18 -

new business may adversely affect our business, financial position and results of operations."

Defendants Ryan, Rickard, Banks, Brown, Dorman, Gibney Williams, Heard, Joyce, Millon, Murray,

Piccolo, Rosenberg, and Swift, who each signed the fiscal 2008 Form 10-K, were well aware of this

risk factor.

49.     A substantial portion of the Pharmacy Services Segment's revenues are also derived

from drug benefits provided to eligible beneficiaries under the Federal Government's Medicare Part

D program.    In order to provide Medicare Part D services, CVS must enter into an annual

competitive bidding process with other PBM service providers. The Company's ability to properly

bid to be a provider of these services is material. The 2008 Form 10-K includes as a material risk

factor that "if [CVS is] not successful in retaining enrollees, or winning contract renewals or new

contracts under the Medicare Drug Benefit's competitive bidding process, our Medicare Part D

services and the ability to expand our Medicare Part D services could be materially and adversely

affected, and our business, financial position and results of operations may be adversely affected."

Defendants Ryan, Rickard, Banks, Brown, Dorman, Gibney Williams, Heard, Joyce, Millon, Murray,

Piccolo, Rosenberg, and Swift, who each signed the fiscal 2008 Form 10-K, were also well aware of

this risk factor.

50.     Due to the importance of the 2009 selling season to expected 2010 revenues, investors

and analysts paid particular attention to CVS' disclosures regarding the season's prospects.  For

example, Morgan Stanley & Co. analysts Mark Wiltamuth and Joseph Parkhill commented in a May

5, 2009 analyst report that "Proving that the PBM is Returning to Growth is Key."  The report

provided further that "we believe investors will be highly focused on whether or not the PBM will be

able to return to double-digit growth (vs. the 2-5% operating gains promised for 2009)."

51.     Early on in the 2009 selling season, during May 2009, CVS suffered a major setback represented by the loss of a PBM service contract with Coventry Health Care Inc. ("Coventry"), which amounted to a $1.4 billion loss in revenues. Defendant Ryan, however, disclosed that the loss of the Coventry contract had been expected and factored into the goals that the Company set for 2010. Later, during the 2009 selling season, during July 2009, CVS lost a second major PBM contract with Chrysler Group, LLC ("Chrysler") to provide services to Chrysler union retirees that represented $400 million in lost revenues. Defendant Ryan, however, again explained that this was not surprising.

52.     Despite these setbacks, defendant Ryan made false and misleading optimistic statements regarding the 2009 selling season based upon CVS' combined Retail Pharmacy Segment and PBM business model and its Maintenance Choice program that supposedly took advantage of that model to promote more business for the Pharmacy Services Segment. Under the Maintenance Choice program, health plan members can choose to pick up their prescriptions at CVS retail store at mail-order prices rather than just receive prescriptions by mail.

53.     During the 2009 selling season, CVS heavily marketed the Maintenance Choice program to PBM clients as means of lowering overall healthcare costs. A large number of clients, however, were not impressed with this message. These clients felt that the Maintenance Choice program was little more than a thinly veiled attempt to drive up revenues at the CVS retail stores. Moreover, CVS' PBM competitors picked up on this message and alerted potential clients to avoid this conflict of interest posed by the Maintenance Choice program—the fact that CVS appeared to be more interested in driving up its retail revenues rather than maintaining quality PBM services. A large number of customers heeded CVS' competitors' warnings, and the result was a net loss of approximately $4.8 billion in contracts for the 2009 selling season.

## FALSE AND MISLEADING STATEMENTS

54.     The following false and misleading statements wrongfully suggested that CVS' PBM business prospects were strong despite the loss of the Coventry and Chrysler PBM contracts. These statements also wrongfully suggested that CVS' combined business model and its Maintenance Choice program would have the effect of greater PBM contract wins. In truth, however, potential and renewal PBM clients were not impressed with CVS' marketing program, which actually had the effect of driving PBM contracts to the Company's competitors.

### False and Misleading First Quarter 2009 Statements

55.     On May 5, 2009, CVS issued an earnings press release announcing its fiscal first quarter 2009 financial results. The press release reported a 7.2% increase in revenues related to the Pharmacy Services Segment. Further, the press release reported that "the first quarter reflects the short-term margin investments in key PBM contracts that should help drive long-term performance." Defendant Ryan commented in the press release that the Company's "performance reflects *healthy underlying growth* in our business, with solid revenue increases and share gains across the enterprise."[1]

56.     Also on May 5, 2009, CVS hosted an earnings conference call to discuss the Company's earnings with analysts and investors. During the call, defendant Ryan commented that CVS' "[t]otal revenues increased 9.7% with PBM revenues up 7.2%, and retail revenues up 13.9%, and that's even with one fewer day than last year." Defendant Ryan also touted the PBM segment's revenues, explaining that "[o]n a 2009 impact basis, [CVS'] gross new revenues are $7.6 billion. This is up from previously reported $7.0 billion and our net new 2009 revenues are $3 billion, up from

---

[1] Here, as throughout, all emphasis is deemed added unless otherwise noted.

previously announced $2.5 billion." Ryan explained further that these increased revenues were primarily driven by "an increase in Med D revenues due to higher enrollment."

57.    With respect to the 2009 selling season during which CVS seeks PBM contract wins for 2010, defendant Ryan reported that "we see plenty of new business opportunities for 2010 and we're very pleased with the early results of the season. In addition, clients are more open to -- than ever to changes in plan design and other cost containment tools to save money." Defendant Ryan acknowledged the loss of the $1 billion Coventry contract (which was later disclosed to be worth $1.4 billion), but insisted that the contract loss was not "unexpected." Ryan explained further that as "we began to set our goals for 2010, *the loss of this account was considered*."

58.    Later during the call, during the question and answer session, an analyst from Goldman, Sachs & Co. asked defendant Ryan to explain how CVS' new business model and, in particular, its Maintenance Choice program factored into the Company's ability to win new PBM contracts. Ryan's response indicated that the new model was a big plus with new clients because it would allow them to lower their overall healthcare costs. Specifically, Ryan answered as follows:

> Once you have the price discussion kind of out the way, what is your price for generics, what is your price on mail, retail, specialty, et cetera, now the discussion comes around how can we help them -- how can we help them lower *their overall healthcare costs*? And one of the ways is *Maintenance Choice is why it's so big*. We just came from a client conference and I can't tell you the number of people that have come up to me and just said we were thinking about mandatory mail, we didn't want to do anything mandatory. Moving our people to more mail order prescriptions, this is a perfect opportunity for us. It's kind of the best of both worlds.
>
> So I think that combined with our proactive pharmacy care program, where we're trying to intervene earlier and help our -- help our payers, help our clients lower their overall healthcare cost. That kind of discussion is happening more in the last -- certainly in the last six months to a year than it happened, obviously, before that. Certainly when we -- we never had that discussion before, really.

59.    Later during the call, during the question and answer session, an analyst from Barclays Capital asked defendant Ryan about the new business that would be available for the PBM

segment in 2010. Ryan responded that "we're essentially on plan, in good shape, and obviously we feel comfortable where we are with some of the new business going on."

**False and Misleading Second Quarter 2009 Statements**

60.     On August 4, 2009, CVS issued its fiscal second quarter 2009 earnings press release. The press release reported that the PBM segment's revenues increased 22.1% to $13 billion during the second quarter. Defendant Ryan commented in the press release that "[t]his is shaping up to be a very good year and *we expect an even better 2010*."

61.     Also, on August 4, 2009, CVS hosted an investor conference call to discuss its fiscal second quarter 2009 earnings. During the call, defendant Ryan commented that with respect to earnings per share growth in 2010, he "would be very disappointed if [CVS] didn't have an *EPS growth of at least 13 to 15% next year*."

62.     During the call, defendant Ryan again acknowledged the $1.4 billon Coventry contract loss and noted an additional $400 million PBM contract loss with Chrysler, which he characterized as not surprising. Defendant Ryan also commented as follows with respect to the 2009 selling season:

> We are still in the middle of the 2010 selling season, so we will have more on the third quarter call. But we have had some good successes, and we have had some disappointments. We now have over 3,000 clients under contract, and our retention rate for 2010 is 96%, which is slightly higher than 2009. As previously reported, we lost the Coventry commercial contract, which was worth $1.4 billion, which was *widely expected*.

> And recently the newly formed UAW VEBA group decided to consolidate all of the autos under one contract. As a result, we lost the Chrysler UAW retirees to Blue Cross/Blue Shield of Michigan. Given the fact that Chrysler contract was $400 million, and was the smallest of the Big 3 autos, *we really weren't surprised* that it

- 23 -

consolidated into the other two. It is important to note that the renewed Chrysler

actives, as well as their non-union employees, will stay with us.

63.    Later during the call, during the question and answer session, an analyst with

Goldman, Sachs & Co. asked defendant Ryan whether "pricing from competitors overcome the

benefits of Maintenance Choice, such that it may be hard at least in the short term to pick up a lot of

new business...." In response, defendant Ryan continued to tout the cost-cutting potential of the

Maintenance Choice program. In particular, Ryan answered as follows:

> It is always price. I think marketplace is fairly rational. I can tell you, I have
> mentioned it before, we were kind of the driver early on, especially for some key
> clients, but I think the market is fairly rational now. Now could someone come in and
> drop a low ball price on something that an existing client has, and you got a client
> that maybe is in trouble, given this economy? Sure, that could happen.

> But I think in the long run, when they think about how they are going to **lower their
> overall healthcare cost in this model**, how it addresses **lowering their overall
> healthcare costs** because it engages the consumer, and not just on the phone, or mail,
> but face to face, in a variety of ways, and offers a lot more options, they make the
> decision. But, yes, John, price is always going to be a factor.

### THE TRUTH IS REVEALED

64.    On October 2, 2009, CVS disclosed that the Company had only successfully bid for

fifteen Medicare Part D regions comprising twenty-seven states for 2010, compared to the thirty

regions comprising forty-six states that the Company had secured for 2009. CVS disclosed further

that, based on the Medicare Part D bidding results, the Company expected a negative impact to 2010

earnings per share of $0.03 to $0.04.

65.    Then, on November 5, 2009, during CVS' third quarter earnings investor conference

call, defendant Ryan revealed that, following the 2009 selling season, CVS lost $4.8 billion net

worth of PBM contracts (taking into account contracts gained and contracts lost). The PBM contract

losses included a $1 billion contract with Horizon Blue Cross Blue Shield of New Jersey; a $500

million contract with the managed Medicare business of the State of Ohio; and $600 million worth of miscellaneous PBM contracts. These contract losses came on top of the previously disclosed losses related to lost Medicare Part D beneficiaries that amounted to approximately $1.7 billion; the $400 million contract with Chrysler; and the $1.4 billion contract with Coventry Commercial.

66.    Based on the net contract losses that CVS experienced during the 2009 selling season, defendant Ryan admitted in the call that his earlier prediction of 2010 earnings per share growth of 13 to 15% was "not going to happen." Ryan disclosed further that the "operating profit in the PBM will decline in 2010 . . . [p]erhaps as much as 10% to 12%."

67.    During the same call, defendant Ryan announced the immediate retirement of former PBM head, defendant McLure. Ryan also announced the hiring of a new Senior Vice President of Marketing for the PBM segment. These disclosures were the first hints at to the primary cause of the $4.8 billion worth of lost contracts—CVS' PBM clients were not persuaded by the Company's marketing campaign that promoted the Company's combined business model and Maintenance Choice program.

68.    Also on November 5, 2009, CVS belatedly disclosed in its fiscal third quarter 2009 Form 10-Q that, during August 2009, the Federal Trade Commission ("FTC") began an investigation of the Company's business practices. Although CVS did not disclose which business practices were under investigation, according to *Bloomberg News*, members of congress asked the FTC to investigate whether CVS overcharges consumers, sells private customer data, and favors higher-priced drugs in order to collect manufacturer rebates.

69.    Following these disclosures, CVS' share price declined from $36.15 per share on November 4, 2009 to $28.87 per share on November 5, 2009, which represents a market capitalization loss of $10.1 billion.

70.     In the weeks that followed, defendant Ryan disclosed further specifics as to what went wrong during the 2009 selling season. During a November 12, 2009 Credit Suisse Healthcare investor conference, defendant Ryan admitted that the Medicare Part D losses were the result of poor contract bidding by CVS. Moreover, this was a known problem at the Company that went uncorrected. Apparently, during the 2008 selling season, CVS' bids were too low, which resulted in lower profit margins during 2009. And during the 2010 selling season, CVS' bids were too high, which resulted in the $1.7 billion in lost Medicare Part D beneficiaries. Ryan further admitted that the loss "was a surprise," which indicates that CVS did not have a proper procedure or process to determine correctly valued bids.

71.     With respect to the lost Coventry contract, defendant Ryan admitted that pricing was an issue.

72.     With respect to CVS' failure to land new PBM contracts to offset the lost contracts, defendant Ryan admitted that the Company's marketing message was a serious issue. In particular, Ryan admitted that "[w]e focus[ed] too much on the retail side;" and "[w]e forgot to talk about the PBM capabilities." In other words, in direct contradiction to Ryan's earlier statements, PBM customers were not impressed with CVS' combined business model and its Maintenance Choice program. Indeed, many clients saw the Maintenance Choice program as a thinly disguised vehicle to drive healthcare plan participants into CVS retail stores as a means of driving up retail sails. Ryan admitted further that CVS' competitors picked up on this "conflict of interest" to drive PBM clients away from CVS.

73.     Defendant Ryan also admitted during the call, that "Caremark *never had a great relationship* with consultants *over the years*." PBM consultants are the key players in the PBM industry that could have advised CVS with respect to its poor marketing efforts. Defendant Ryan

knew that CVS did not have these key relationships and yet recklessly and knowingly made false statements with respect to expected growth in 2010 on the basis of PBM contract wins that would never materialize.

### THE IMPROPER BUYBACK

74.    On May 7, 2008, the Board authorized a share repurchase plan under which the Company was authorized to repurchase up to 2 billion shares of its own stock. Under this plan, during July 2009 through November 2009, while CVS' stock was artificially inflated due to the false and misleading statements above, the Officer Defendants authorized and the Director Defendants failed to halt the buyback of over $1.99 billion worth of CVS' stock at an average price of approximately $34.07 per share, which is substantially higher than CVS' current share price of less than $31.03 per share (yet lower than the $34.31 per share that the Insider Selling Defendants averaged in selling their own CVS stock holdings).

75.    In particular, during July 2009, CVS repurchased 20,542,568 shares at an average price per share of $32.08 for an aggregate cost of $659 million. During August 2009, CVS repurchased 12,547,379 shares at an average price per share of $35.07 for an aggregate cost of $440 million. And during September 2009, CVS repurchased 12,086,616 shares at an average price per share of $36.40 for an aggregate cost of $439 million. CVS has not yet disclosed the exact amount of shares repurchased during October 2009. But, based upon statements made by defendant Ryan during the November 17, 2009 Lazard Capital Healthcare investor conference that the repurchase plan "had less than $1 million left to go out of $2 billion" as of November 5, 2009, CVS repurchased approximately $461 million worth of additional shares during October.

76.     In authorizing and failing to halt the buyback, defendant Ryan and the Director Defendants knowingly or recklessly wasted corporate assets because they directed the Company to repurchase its own shares at artificially inflated prices.

## DAMAGES TO CVS CAUSED BY THE INDIVIDUAL DEFENDANTS

77.     As a result of the Individual Defendants' wrongful conduct, CVS disseminated improper statements that misrepresented the Company's 2010 PBM business prospects. The improper statements have devastated CVS' credibility as reflected by the Company's $10.1 billion market capitalization loss. Additionally, CVS is now the subject of shareholder class action lawsuits alleging securities laws violations in connection with the misrepresentations regarding the Company's 2010 PBM business prospects. The Company will face substantial costs in connection with these lawsuits.

78.     Further, as a direct and proximate result of the Individual Defendants' conduct, CVS has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in connection with the $1.99 billion stock buyback;

(b)     cost incurred in connection with the FTC's investigation;

(c)     costs incurred in connection with lost PBM contracts;

(d)     costs incurred in investigating and defending CVS and certain officers in the class action lawsuits, plus potentially billions of dollars in settlement or to satisfy an adverse judgment; and

(e)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to CVS.

79.    Moreover, these actions have irreparably damaged CVS' corporate image and goodwill. For at least the foreseeable future, CVS will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that CVS' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SALES

80.    The Insider Selling Defendants made the following sales of their personally held CVS stock while in possession of material non-public information regarding the Company's 2010 PBM and business prospects.

| Defendant | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| GIBNEY WILLIAMS | 5/12/2009 | 127,431 | $32.85 | $4,186,223.04 |
| Total: | | 127,431 | | $4,186,223.04 |
| | | | | |
| MCLURE | 8/7/2009 | 136,258 | $34.18 | $4,656,821.54 |
| | 8/7/2009 | 63,742 | $34.42 | $2,193,789.29 |
| | 9/1/2009 | 100,000 | $37.45 | $3,744,650.00 |
| | 10/1/2009 | 96,717 | $35.63 | $3,445,784.92 |
| | 10/1/2009 | 3,283 | $35.88 | $117,779.92 |
| | 11/2/2009 | 100,000 | $35.71 | $3,570,960.00 |
| Total: | | 500,000 | | $17,729,785.67 |
| | | | | |
| RICKARD | 8/17/2009 | 251,520 | $33.96 | $8,540,864.64 |
| Total: | | 251,520 | | $8,540,864.64 |
| | | | | |
| ROBERTS | 6/17/2009 | 104,000 | $31.06 | $3,230,728.80 |
| Total: | | 104,000 | | $3,230,728.80 |
| | | | | |
| RYAN | 8/7/2009 | 400,000 | $34.41 | $13,763,120.00 |
| Total: | | 400,000 | | $13,763,120.00 |
| | | | | |
| TOTAL: | | 1,382,951 | | $47,450,722.15 |

81.    The Insider Selling Defendants' sales are suspicious considering the percentage of their total CVS holdings that they sold during the Suspicious Sales Period and a comparison of the

number of shares sold during the Suspicious Sales Period with the number of shares sold during the Pre-Sales Period (November 1, 2008 to May 4, 2009.) In particular, Gibney Williams sold $4.1 million of her personally held shares or 68.09% of her total CVS holdings during the Suspicious Sales Period compared to no sales during the Pre-Sales Period; defendant McLure sold $17.7 million of his personally held shares or 98.84% of his total CVS holdings during the Suspicious Sales Period compared to no sales during the Pre-Sales Period; defendant Rickard sold $8.5 million of his personally held shares or 51.95% of his total CVS holdings during the Suspicious Sales Period compared to no sales during the Pre-Sales Period; defendant Roberts sold $3.2 million of his personally held shares or 79.55% of his total CVS holdings during the Suspicious Sales Period compared to no sales during the Pre-Sales Period; and defendant Ryan sold $13.7 million of his personally held shares or 22.05% of his total CVS holdings during the Suspicious Sales Period compared to sales of $42,585 or 0.24% of his total CVS holdings during the Pre-Sales Period.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.     Plaintiff brings this action derivatively in the right and for the benefit of CVS to redress injuries suffered, and to be suffered, by CVS as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. CVS is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

83.     Plaintiff will adequately and fairly represent the interests of CVS in enforcing and prosecuting its rights.

84.     Plaintiff was a shareholder of CVS at the time of the wrongdoing complained of and has continuously been a shareholder and is a current CVS shareholder.

85.    The current Board of CVS consists of the following twelve individuals: defendants Ryan, Gibney Williams, Joyce, Murray, Rosenberg, Heard, Dorman, Swift, Banks, Brown, Millon, and Piccolo.

### Demand Futility as to Defendant Ryan

86.    As alleged above, defendant Ryan breached his fiduciary duties of care and loyalty and good faith by making false and misleading statements regarding CVS' 2010 PBM business prospects. As a result, Ryan faces a sufficiently substantial likelihood of liability for his breach of fiduciary duty. Accordingly, demand is futile as to defendant Ryan.

87.    The principal professional occupation of defendant Ryan is his employment with CVS, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, CVS paid defendant Ryan the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $1,400,000 | $8,902,769 | $4,083,648 | $4,568,503 | $4,681,613 | $466,115 |
| 2007 | $1,350,000 | $9,390,798 | $3,486,931 | $7,808,034 | $3,505,295 | $556,732 |

Accordingly, defendant Ryan is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Ryan.

88.    If defendant Ryan were to bring this action against himself, he would thereby expose his own misconduct, which underlies allegations against him contained in class action complaints for violations of securities law, which admissions would impair his defense of the class actions and

greatly increase the probability of his personal liability in the class actions. In essence, he would be forced to take positions contrary to the defenses he will likely assert in the securities class actions. This he will not do. Thus, demand is futile.

### Demand Futility as to Defendants Ryan and Gibney Williams

89. During the Suspicious Sales Period, defendants Ryan and Gibney Williams sold CVS stock under suspicious circumstances as alleged above. These defendants' sales are suspicious because Gibney Williams sold $4.1 million of her personally held shares or 68.09% of her total CVS holdings during the Sales Period compared to no sales during the Pre-Sales Period; and Ryan sold $13.7 million of his personally held shares or 22.05% of his total CVS holdings during the Sales Period compared to sales of $42,585 or 0.24% of his total CVS holdings during the Pre-Sales Period. As a result, Ryan and Gibney Williams face a sufficiently substantial likelihood of liability for their breach of fiduciary duty and self dealing. Accordingly, demand is futile as to defendants Ryan and Gibney Williams.

### Demand Futility as to the Audit Committee

90. Defendants Banks, Williams, Heard, Joyce, and Swift, as members of the Audit Committee, were responsible under the Audit Committee charter in effect during 2009 for reviewing and approving the false and misleading earnings press releases and statements made to investors and analysts during conference calls. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved false statements that misled CVS' shareholders regarding CVS' 2010 PBM business prospects. Accordingly, these defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duty of loyalty and good faith. Any demand upon these defendants is futile.

**Demand Futility as to All Director Defendants**

91.     Defendants Ryan, Gibney Williams, Joyce, Murray, Rosenberg, Heard, Dorman, Swift, Banks, Brown, Millon, and Piccolo, as members of the Board during May 2009 through November 2009, failed to halt the repurchase of over $1.99 billion worth of the Company's shares at artificially inflated prices. The Board's decisions to continue the stock repurchase was not the product of valid business judgment. The Board knowingly or recklessly failed to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' 2010 PBM business prospects. Further, defendants Ryan and Gibney Williams engaged in self-dealing in that they sold their personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

92.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by CVS' officers and directors and these acts are incapable of ratification.

93.     Each of the defendant directors of CVS authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

94.     Any suit by the current directors of CVS to remedy these wrongs would likely expose defendants Ryan, Rickard, McLure, and CVS to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

- 33 -

95.    CVS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CVS any part of the damages CVS suffered and will suffer thereby.

96.    If CVS' current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of CVS.  However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by CVS against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause CVS to sue themselves or certain of the officers of CVS, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance, then the current directors will not cause CVS to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

97.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for CVS for any of the wrongdoing alleged by plaintiff herein.

98.    Plaintiff has not made any demand on shareholders of CVS to institute this action since such demand would be a futile and useless act for at least the following reasons:

- 34 -

(a)    CVS is a publicly held company with over 1.4 billion shares outstanding, and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no reasonable way of finding out the names, addresses, or phone numbers of the thousands of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Derivatively Against Defendant Ryan for Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

99.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    As alleged above, during May 2009 through November 2009, defendant Ryan knowingly or recklessly made and caused the publication of false and misleading statements regarding CVS' 2010 PBM business prospects, and knowingly, willfully and acting with scienter caused CVS to repurchase $1.99 billion worth of its own stock on the open market at a weighted average price per share of approximately $34.07, when he knew that CVS' stock price was artificially inflated due to his misleading statements. The repurchases of CVS stock were intended to and did manipulate and/or deceive CVS and its shareholders.

101.    Defendant Ryan thereby violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that he:

(a)    employed devices, schemes and artifices to defraud CVS;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon CVS in connection with the purchases of CVS common stock.

102.    As a direct and proximate result of defendant Ryan's wrongful conduct, CVS has and will suffer damages in connection with its purchases of CVS common stock at prices that he knew to be artificially inflated.

103.    But for defendant Ryan's misconduct, CVS would not have repurchased its stock at artificially inflated prices. CVS reasonably relied on defendant Ryan's diligence, loyalty, and good faith in repurchasing its stock.

104.    Defendant Ryan's conduct proximately caused CVS' loss. CVS' stock price fell from $36.15 per share on November 4, 2009 to $28.87 per share on November 5, 2009 following disclosures that revealed the truth about CVS' 2010 PBM business prospects.

105.    Defendant Ryan is therefore liable to CVS for damages in an amount to be determined at trial pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Derivatively Against Defendants Banks, Williams, Heard, Joyce, and Swift
### for Violation of §20(a) of the Exchange Act

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    The Audit Committee Defendants, Banks, Williams, Heard, Joyce, and Swift, as directors and as members of the Audit Committee, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of earnings

press releases and information disclosed during earnings conference calls that was disseminated by

CVS, and had the power and/or ability directly or indirectly to control or influence defendant Ryan,

as CVS' CEO, in connection with the specific corporate policies and conduct that violated §10(b) of

the Exchange Act and SEC Rule 10b-5 as alleged above.

108.    The Audit Committee Defendants did not act in good faith in regard to these

allegations.  They are jointly and severally liable under §20(a) of the Exchange Act to the same

extent as defendant Ryan for his primary violations of §10(b) and Rule 10b-5 promulgated

thereunder, as set forth herein.


### COUNT III

**Against Defendant Ryan for Breach of Fiduciary Duties of Due Care and Loyalty and
Good Faith for Dissemination of False and Misleading Statements**


109.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

110.    Defendant Ryan owed and owes CVS fiduciary obligations.  By reason of his

fiduciary relationships, Ryan owed and owes CVS the highest obligation of good faith, fair dealing,

loyalty and due care.

111.    Defendant Ryan violated and breached his fiduciary duties of care and loyalty and

good faith by knowingly or recklessly making false statements regarding CVS' 2010 PBM business

prospects.  As alleged above, Ryan's statements falsely suggested that CVS' marketing program that

promoted its combined business model and its Maintenance Choice Program would have the effect

of greater PBM contract wins.  In truth, however, potential and renewal PBM clients were not

impressed with CVS' marketing program, which actually had the effect of driving PBM contracts to

the Company's competitors.

112.    Defendant Ryan's false statements were included in earnings press releases and in conference calls hosted for investors and analysts.

113.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114.    As a direct and proximate result of defendant Ryan's failure to perform his fiduciary obligations, CVS has sustained significant damages. As a result of the misconduct alleged herein, defendant Ryan is liable to the Company.

## COUNT IV

### Against the Audit Committee Defendants for Breach of the Fiduciary Duty of Loyalty and Good Faith

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The Audit Committee Defendants, defendants Banks, Williams, Heard, Joyce, and Swift, owed and owe CVS fiduciary obligations. Additionally, the Audit Committee Defendants owed specific duties under the Audit Committee charter in effect during fiscal 2009 to CVS to review and discuss CVS' quarterly and annual financial results, earnings press releases, and prepared statements and the content of information discussed during earnings conference calls. By reason of their fiduciary relationships, these defendants owed and owe CVS the highest obligation of loyalty, fair dealing and good faith.

117.    The Audit Committee Defendants violated and breached their fiduciary duty of loyalty and good faith by knowingly or recklessly reviewing and approving false statements included in CVS' earnings press releases and made during conference calls to analysts and investors. As alleged above, these statements suggested that CVS' marketing program that promoted its combined business model and its Maintenance Choice program would have the effect of greater PBM contract wins. In

- 38 -

truth, however, potential and renewal PBM clients were not impressed with CVS' marketing program, which actually had the effect of driving PBM contracts to the Company's competitors.

118.    The Audit Committee Defendants' wrongful conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

119.    As a direct and proximate result of the Audit Committee Defendants' failure to perform their fiduciary obligations, CVS has sustained significant damages.  As a result of the misconduct alleged herein, the Audit Committee Defendants are liable to the Company.

## COUNT V

### Against Defendants Ryan, Gibney Williams, Joyce, Murray, Rosenberg, Heard, Dorman, Swift, Banks, Brown, Millon, and Piccolo for Breach of the Fiduciary Duty of Loyalty and Good Faith

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    Defendants Ryan, Gibney Williams, Joyce, Murray, Rosenberg, Heard, Dorman, Swift, Banks, Brown, Millon, and Piccolo violated and breached their fiduciary duty of loyalty and good faith by knowingly or recklessly failing to halt the repurchase of shares while CVS' share price was artificially inflated as a result of false and misleading statements regarding CVS' 2010 PBM business prospects.  While CVS' stock was artificially inflated, CVS repurchased approximately $1.99 billion worth of its own stock at an average price of $34.07.

122.    Defendants Ryan, Gibney Williams, Joyce, Murray, Rosenberg, Heard, Dorman, Swift, Banks, Brown, Millon, and Piccolo's wrongful conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.    As a direct and proximate result of defendants Ryan, Gibney Williams, Joyce, Murray, Rosenberg, Heard, Dorman, Swift, Banks, Brown, Millon, and Piccolo's failure to perform

their fiduciary obligations, CVS has sustained significant damages. As a result of the misconduct alleged herein, these defendants are liable to the Company.

## COUNT VI

### AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY

### Duties for Insider Selling and Misappropriation of Information

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above regarding CVS' true 2010 PBM business prospects, and sold CVS common stock on the basis of such information.

126.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold CVS common stock.

127.    At the time of his stock sales, the Insider Selling Defendants knew that potential and renewal PBM clients were not impressed with CVS' marketing program, which actually had the effect of driving PBM contracts to the Company's competitors. The Insider Selling Defendants' sales of CVS common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duty of loyalty and good faith.

128.    Since the use of the Company's proprietary information for his own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants' obtained thereby.

## COUNT VII

### Against All Defendants for Waste of Corporate Assets

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) directing CVS to repurchase over $1.99 billion of its own stock at artificially inflated prices; (ii) failing to properly consider the interests of the Company and its public shareholders; (iii) failing to conduct proper supervision; (iv) by paying bonuses to certain of its executive officers; and (v) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

131.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

132.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

## COUNT VIII

### Against All Defendants for Unjust Enrichment

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CVS. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to CVS.

135.    Plaintiff, as a shareholder and representative of CVS, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

136.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands for a judgment as follows:

A.    Declaring that defendant Ryan is liable under §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and that defendants Banks, Williams, Heard, Joyce, and Swift are jointly and severally liable under §20(a) of the Exchange Act, and awarding CVS damages on these counts;

B.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Directing CVS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CVS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or

Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

      1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.    a provision to permit the shareholders of CVS to nominate at least three candidates for election to the Board;

      3.    a provision to ensure that CVS complies with all laws and regulations enforced by the FTC;

      4.    a proposal to ensure the adequate monitoring of disclosures regarding CVS' PBM business; and

      5.    a proposal to control insider selling.

      D.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of CVS has an effective remedy;

      E.    Awarding to CVS restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

      F.    Awarding to plaintiff reasonable attorneys' fees, consultant and expert fees, costs and expenses; and

      G.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 22, 2009

Mark Wuotila
By his attorneys,

MOORE, VIRGADAMO & LYNCH, LTD.

JEREMIAH C. LYNCH, III #3968
97 John Clarke Road
Middletown, RI  02842
Telephone: (401) 846-0120
Facsimile:  (401) 848-0234
jlynch@mvllaw.com

ROBBINS UMEDA LLP
MARC M. UMEDA
KEVIN A. SEELY
GREGORY E. DEL GAIZO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

447315

- 44 -

VERIFICATION

I, Mark Wuotila, hereby declare as follows:

I am a shareholder of CVS Caremark Corporation. I was a shareholder at the time of the wrongdoing complained of and have continuously been a shareholder. I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of the Company. I have read the Verified Shareholder Derivative Complaint for Violations of the Securities Exchange Act of 1934, Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment (the "Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 12/17/09

MARK WUOTILA